Good morning and may it please the court, Colin Lebelczyk of Perkins Coie on behalf of petitioners Lester Lopez, his wife Alba, and their daughter Leslie. I'd like to reserve two minutes for rebuttal. I want to start by highlighting what no party here disputes, that the family protested against the Nicaraguan government and was immediately targeted in a brutal crackdown that left over 300 of their fellow protesters dead. The mistreatment that the family suffered escalated over time. It started when Alba began receiving daily text messages threatening her with imprisonment and if she continued protesting. Then Alba and Lester had a physical confrontation with paramilitary forces where they were threatened again and robbed. Counsel, let me ask you this. We've read the brief, so can we focus on the concept of the totality of the circumstances issue? As I read the record, the IJ clearly referred to individual incidents but did not, if you will, consider the totality of the circumstances, although the phrase was used. Since the court used the term totality of the circumstances, has it complied with law? So I think it's murky at best whether the IJ actually completed cumulative effect review. As you know, he said the injury to Lester by itself was not sufficient. The detention of Alba's father alone was not sufficient. And then the third basis, he says that the threats that Alba received and the psychological harm that she suffered alone was not sufficient based on the totality of the circumstances. And I think, you know, when you read the IJ's opinion, I think a reasonable reading of it is that that totality of the circumstances language was limited to the third basis of harm only, to the threats to Alba and the totality of circumstances around those threats and around her psychological harm. But I want to emphasize here that that's not the, even if you disagree that if you think that the IJ did enough here by, you know, using that language, that's not going to be enough for the government to win here because under a de novo standard of review, which should be applied here, I understand that there's a lot of confusion in the Ninth Circuit, but I think the standard of review... So I think that, you know, a lot of your colleagues have written about this issue extensively. It's created a circuit split where, you know, you have six circuits who are saying that de novo review applies. You have five saying that substantial evidence review applies. But I think if you look at the INA, it becomes a pretty clear question of statutory interpretation because the INA provides that administrative findings of fact are reviewed for substantial evidence. And I submit that the question here, whether when you have undisputed facts that are being applied to a legal standard, that is not an administrative finding of fact. That is... Why are they undisputed? So the underlying facts regarding what happened to petitioners, those are kind of the historical facts, the who, what, when, where, why of what happened to them. The IJ found those facts, found the petitioners to be credible, and... So your view is that are you relying on the deemed true if credible rule? So I'm relying on the fact that the IJ's opinion assumes that all of these facts that the petitioners testified to... Well, I'm not sure if that's true because, especially with respect to the sort of double hearsay issue with what the, I can't remember, one of the petitioner's fathers, your father-in-law, is, you know, the IJ does appear to be somewhat skeptical. Would you agree that the IJ seems to be somewhat skeptical that some of those things happened, that some of those things happened? I don't know if that's the way I read the IJ's opinion. I think the IJ found them credible, listed off, you know, kind of gave a... But it's kind of a weird deal because if I were to tell you that, you know, Judge Smith told me, that Judge Gilman told me, that Judge Wardlaw told him, that Judge Stone, you know, if I give you a long train like that, you can say I'm credible and that you don't think I'm a liar, right? But you might be skeptical. The longer that train gets of hearsay, you might be skeptical that there might be a break in there some way, that maybe perhaps even Judge Smith, like, didn't quite understand Judge Gilman or something, or maybe it just, even without thinking, anybody's not credible. And so that seems to be what the Supreme Court, one of the issues the Supreme Court was getting at when it says that you can be credible, but you're not necessarily persuasive or it doesn't necessarily, you know, the weight of how much that testimony is given can vary. And here, even though that they might have thought, well, I didn't catch you guys in a lie, but I'm still not sure I believe this double hearsay of all the stuff that happened to your father. And there seems to be some indication of that because it does, the IJ does express some uncertainty as to whether these things happened to the father. Would you agree with that? I don't know if I saw that closely in the IJ's opinion. I think that the IJ, you know, he marched through everything that happened. The government, of course, had a, you know, they had a chance to demonstrate adverse credibility and that didn't happen. So I think that here we do have a set of facts that are being applied to a legal principle. He says the government officials detained the correspondent's father for unknown reasons, right? But, you know, they said that our father told them these things, right? So you either have to think that the IJ just completely missed that, even though the IJ recited that earlier in the very same opinion, or you have to think that the IJ is basically saying, I'm not sure what the real reason here was. Well, I think the IJ goes on to, even though he does say unknown reasons, he does go through and say that. He says alternatively, even if it was for political reasons, you still lose. But that also just seems to indicate the IJ has some skepticism that the whole story about the father is exactly what actually, factually went down. Which is, I'm just basically saying, was the IJ required to believe that everything they said was factually true just because they were deemed credible? And it seems like that was your position, but I'm not sure. Yeah, I think that, I think I would say that, of course, and there is a, you know, a middle ground between an express adverse credibility finding and a IJ crediting every single thing that the petitioner said. But not under a deemed true of credible rule. Do you think that still exists in our circuit or not? Yes, I believe it does. You don't think Ming Dai killed that Supreme Court? Oh, yes, I believe that that, right, of course, the Supreme Court, the animus, yes, that is, yes, that is, that is, of course, binding law here. But I don't, I think that another Supreme Court decision that you can look to for the standard of review is the, is the Gasparilla case that was in from 20, from 2020, where the Supreme Court said that in the INA, the phrase question of law, is something that's encompassed in that phrase, is the application of facts to a legal standard. And I think that's what you have here in persecution. No, but the reason this matters, I'm having a discussion, I get, we've said that, that the, that the cumulative effects is a legal, which makes sense, but only if you understand that the facts that feed into that, you, we still give deference, we still give, and I think we said that too, that there's substantial evidence. And then, so, so I think the government's position here would be, well, it depends what facts you're feeding in there. If you're feeding in that everything that these people said is absolute gospel, and we know that it 100% happened that way, that's one thing. But it's another thing if the, if we think that the IJ was able to, was able to put different weight on those facts, and to find certain statements more or less persuasive about what happened. And I thought that we were more in that latter land, but not if, not if the deemed true of credible rule exists. So the deemed true of credible, just to be clear, that, that rule after Ming Dai, as you said, does no longer, no let me interject here, because this is an important discussion, I think, amongst the panel. Ming Dai doesn't say anything about a situation where the IJ has expressly found the petitioner is credible, and there's nothing to the contrary, right? That's correct. So if that's what we have here, and the relevant facts, Ming Dai doesn't apply, right? That's right. Okay. And I think you can, you can look to some of your colleagues' concurrences. I think another, another big point on the standard of review is that the BIA itself, when they're reviewing an IJ's opinion, they, when they're deciding whether the, whether there's been past persecution here, they review that determination de novo. So I think it would be quite strange if that question, when that exact same question comes up from this court, a different standard applies. I think that Judge Collins wrote this in the Fon case. He said that, you know, it would be strange indeed if something that was considered a legal question below was transmogrified into a, into a factual question above. And I think that's, that's what we have here. And I just want to, I see my time is running out, but... It's actually out. I'll tell you what, since we've asked a lot of questions, we'll give you a little bit of rebuttal time. So let's hear from the government, and then we'll give you a couple of minutes to respond, okay? Thank you. All right, Ms. Vick, right? Good morning, Your Honors. Lindsay Vick, on behalf of the Attorney General. I'd like to start by talking a little bit about the standard of review here. And so what we're looking at is, we're looking at the IJ's past persecution determination, and specifically the seriousness of harm prong. And that seriousness of harm prong is a fact-based inquiry. So we're looking at whether there is substantial evidence, or whether the record compels reversal on that serious harm finding. And the court should find here that it doesn't, the record does not compel reversal. And that is because... What's your best argument for that? My best argument is that this case involves three isolated sporadic incidents over the course of three years. And they happened to Alba and Lester, who are the two respondents. And actually, the IJ was very generous in including the analysis of what happened to Alba's father, because he was unrelated to their claims. He's not a respondent. Her testimony is that he threatened that if he didn't stop participating in marches in his family, didn't they were going to kill him and his family, which would include Lester and Alba. Well, the threat didn't explicitly include Lester and Alba. We don't know that it was just more than hyperbole. All we know is that he came... From the record, it sounds like no, they would kill his family. There was one isolated death threat when he was detained. How many death threats do you need? Well, I'm just saying, in this case, we have Alba's father, who was arrested for unknown reasons, for something he possibly did. And it was not in connection with either Alba or Lester. And then when he was in detention, he was not beaten. He was not harmed. And then he says that one of the police officers said, you know, if you do this again, I'll kill you or your family. And again, we don't know that that is specific or particular to Alba or Lester. And so... Would it be? I mean, he wasn't talking about you or me. Family, that would have to be Lester and Alba, wouldn't it? Well, I think, considering all the circumstances, we don't have any other threats towards Alba's father. But we also don't have a pattern of persecution linking the three people together. What about the rock that was thrown at Lester's foot or ankle and disabled him for three months? Yes, so that was one instance to Lester, and so for his claim of harm. We have to look at the claims of harm individually for each applicant. That's the whole point. Or do you have to look at them cumulatively? That's one of the big issues. You look at the cumulative harm as to each applicant. But these applicants have not established a pattern of persecution that links them together. Even when the threat is made to that person or your family? That, as my colleague had just pointed out, the threat was to them or the family. And I don't think that one instance of a death threat that says, I'll kill you and your family, creates a pattern of persecution that links the three isolated individuals. This is almost like 1984. We're talking Nicaragua here. I think it's pretty self-evident that the government of the United States, I don't think it's changed its policy, views the Ortega regime and what it's been doing for years as being pretty sinister. Don't we have to take that into account when we consider whether or not these threats are just idle? These are political claims that are being made. It's a protected category. I find it kind of unusual that the government's saying, this Ortega's a great guy. He wouldn't do anything wrong. Isn't that what you're basically asking us to do? I'm, well, no, I'm certainly not saying that. But what I'm saying is that we need to look at the harm each applicant claims. And Alba's father is not an applicant. But again, as my colleague has pointed out, the threat was to the applicant and family. There's evidence of something done to the family. That's part of the same threat. I mean, we've got lots of cases that say that, right? Right. But here, when Lester was attacked, Alba had nothing to do with it. She wasn't with him. They didn't say anything about her. It was two years after her incident with the text messages and the phones. And we don't even know that Lester actually attended the April March, the April 2018 March. We know that Alba did. And then she received threatening text messages. And they were threatening her with imprisonment and torture, not death threats. But it's a consistent pattern. Anybody that sticks their head up, there's a threat. Maybe not at the same time, but part of the same family, right? I'm sorry, could you? In other words, you've got different threats to different people, but they're still part of the same family. They're consistent with it. If you get involved politically, you're gonna have a problem. Maybe you got killed. It's the same thing, is it not? I don't think so. Because again, what happened with Alba was she attended a march. She was no longer a member of a political party. And then she received some threatening text messages. Because the party was dissolved. Correct. And she doesn't know who the text messages came from. And then she was stopped by a police officer. Her phone was confiscated. But during that time, there's no evidence that they were also after Lester or they didn't say anything about him. And again, that was one incident. And it was two years later that Lester had the incident on the street. That tends to show they're still after them because of their participation or support for the opposition party. What about the fact then they fled Nicaragua? And there's evidence that the police were inquiring where they were after they fled, right? There's evidence. It was kind of vague testimony about police officers going to, I think, siblings home in Nicaragua. I think they were searching for them, but there were no details of a I guess I'm particularly thinking about future harm. I guess the petitioners are saying, look, if we're sent back, the country conditions report says that many all many deportees from the U.S. back to Nicaragua get arrested upon return and disappear. Is that an unreasonable fear of these of this couple? It's, it's a subject, it may be subjectively reasonable. However, they don't have an objectively reasonable fear of future harm. Why not? I mean, the country report says that the people in their group, meaning people who fled and now are repatriated, forcibly get arrested. Well, they're part of that group, are they not? There's, there's no evidence that anyone is continuing to look for them. They have family members. I think Alba has about nine siblings. Maybe not all are in Nicaragua, but many of them are in Nicaragua and they have not experienced any harm. Well, maybe that's because they weren't politically active like Alba or they didn't participate in this anti-government march. Well, that, I mean, that could be, that would, that would be speculation, but I think it's important to remember that this case is a lot like this court's decisions in, in Sharma, Prasad, and Duran-Rodriguez, where there was really just three isolated incidents and they did not rise to the level of serious harm that this court found in Flores, Medina. In Flores, Medina, the petitioner was a very active, publicly active protester in Nicaragua and he witnessed his friend die. He was shot in front of him. He had death threats spray-painted on his house. He fled twice. He was tracked down and I, I believe he was beaten at the second encounter and here we just, we just don't have that. We have one instance of detention to someone who is at best very, a little linked to Alba and Lester. The father. Yeah, well, his, well, I mean, I mean, his, his harm is, is somewhat linked, but, and we only, and we have, again, the harm to Alba in 2018 and then the harm to Lester in 2020. So, two years went by and, and nothing, nothing was happening. And so... You say nothing was happening. There's sort of a pattern of something happening post-MARC participation in the MARCH. Well, they didn't testify about any continued threats throughout 2018 or 2019. There was no, there's just no testimony about continued abuses other than these isolated, sporadic incidents. And so, in, in Prasad, that's a case where this court found that the harm did not rise to the level of past persecution, where the petitioner was detained for four to six hours, he was beaten, and that is certainly much more menacing than what Lester experienced. Can we shift just for a second? What's your response to the petitioner's argument that when the BIA cites Bourbono, that all issues not explicitly raised before the BIA, but asserted before the IJ, are considered exhausted? So, I, I believe that's correct. You, we are looking at the IJ's decision here. So, issues brought before the IJ. Okay. Other questions of the government by my colleague? Thank you very much, counsel. Thank you. Appreciate it. All right. Mr. Zerbedek? Great. Thanks. So, I just want to quickly respond to a couple of the arguments the government made. So, the government said a few things that I think are, are, you know, made very difficult to argue based on the Sharma case and the seven factors that guide this court's past persecution analysis. Harm to a family member is explicitly, is, goes into the analysis. This is not something that, you know, you take every family, only the things that happen to the petitioners. You need to look at, broadly, what happened to the family. And here, we have six of the seven Sharma factors that are met here. We have a continued, you know, pattern of isolated, of, sorry, pattern of escalating mistreatment. We have a physical injury. We have harm to the family members. We have country, country and turmoil, where the country condition reports make very clear that, you know, the things, things that are happening in Nicaragua to this exact group of people are, you know, recurring and very troubling. They, the government also mentioned the Duran and Prasad cases. Those cases are very different than the ones we have here. In Duran, there was no physical violence. I know Judge Smith wrote a concurrence in that case. It had to do with two threats. And Prasad was, this was an isolated incident case. This is, there was one detention, as the government mentioned. There's some, some very tough things that happened during that. But, you know, the petitioner was not able to bring up anything else that, that happened to him outside of that one incident. Here, we have a pattern. And I think the government, a couple of times, referenced the fact that there were gaps in between, you know, what happened to this family. But I think that, the gaps actually very much strengthened the, the petitioner's case, because they showed that there's a continued interest in them. After three years, they participated in one march. And in between, in between the, the instances of mistreatment, they were essentially in hiding. They would only go grocery shopping once a month. So, I think that, you know, the fact that there's, there's a bit of a time gap here is, is not at all, you know, should not weigh against them. And if anything, it should, it should support their claim. Other questions by a colleague? Thanks to both counsel for your argument. We appreciate it. The case just argued is submitted.
judges: Gilman, SMITH, VANDYKE